# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# NORFOLK DIVISION

| | |
|---|---|
| IN RE: ZETIA (EZETIMIBE) ANTITRUST LITIGATION | MDL No. 2:18-md-2836 |
| THIS DOCUMENT RELATES TO: ALL DIRECT PURCHASER CASES | |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS GLENMARK PHARMACEUTICALS, LTD. AND GLENMARK GENERICS INC., USA'S MOTION TO DISMISS DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

J. Kevin Fee (Bar. No. 88376)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C. 20005
Tel: 202.739.3000
Fax: 202.739.3001
kevin.fee@morganlewis.com

Steven A. Reed (admitted *pro hac vice*)
R. Brendan Fee (admitted *pro hac vice*)
Zachary M. Johns (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel: 215.963.5000
Fax: 215.963.5001
steven.reed@morganlewis.com
brendan.fee@morganlewis.com
zachary.johns@morganlewis.com

Stacey Anne Mahoney (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178
Tel: 212.309.6000
Fax: 212.309.6001
stacey.mahoney@morganlewis.com

*Counsel for Defendants*
*Glenmark Pharmaceuticals, Ltd. and Glenmark Pharmaceuticals Inc., USA incorrectly identified as Glenmark Generics Inc., USA*

DATED: November 16, 2018

## **TABLE OF CONTENTS**

                                                                                                                                                **Page**

I.      INTRODUCTION ................................................................................................................1

II.     ARGUMENT ......................................................................................................................2

           A.      DPPs' Argument That Their Allegations Should Be Credited Over the Plain Terms of the Settlement Agreement Is Wrong ................................................2

           B.      DPPs Ignore the Relevant Terms of the Settlement Agreement and Misconstrue Others in an Effort to Create a No-AG Commitment Where None Exists ................................................................................................................3

                   1.      DPPs Ignore That the Settlement Agreement Reserved For Merck the Ability to Launch an AG Itself or Through a Subsidiary .....................3

                   2.      None of DPPs' Cases Involved Agreements In Which the Brand Preserved Its Own Ability To Sell An AG .................................................7

                   3.      The Other Settlement Agreement Provisions That DPPs Cite Do Not Support Their No-AG Theory .............................................................9

           C.      DPPs Have No Response to the Argument That, Because the Patent Was Upheld As Valid, Their Theory of Anticompetitive Effects Is Implausible ........10

           D.      DPPs' Opposition Does Not Identify Any Well-Pled Facts From Which the Requisite Inference of Specific Intent to Monopolize Could Be Drawn ........12

           E.      DPPs' Claims Should Be Dismissed With Prejudice ..........................................13

III.    CONCLUSION ................................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adbul-Mumit v. Alexandria Hyundai, LLC*,
896 F.3d 278 (4th Cir. 2018) ..................................................................................................13

*A.G. ex rel. Maddox v. v. Elsevier, Inc.*,
732 F.3d 77 (1st Cir. 2013) ....................................................................................................12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................................12

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ..........................................................................................................12, 13

*Bell Atl. Corp v. Twombly*,
550 U.S. 544 (2007) ..........................................................................................................11, 12

*Cozzarelli v. Inspire Pharm. Inc.*,
549 F.3d 618 (4th Cir. 2008) ..................................................................................................14

*FTC v. Actavis*,
570 U.S. 136 (2013) .........................................................................................................*passim*

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*,
791 F.3d 388 (3d Cir. 2015) ......................................................................................................8

*In re Lipitor Antitrust Litig.*,
868 F.3d 231 (3d Cir. 2017) .........................................................................................8, 10, 11

*In re Loestrin 24 Fe Antitrust Litig.*,
261 F. Supp. 3d 307 (D.R.I. 2017) ...........................................................................................8

*MacDonald v. CashCall, Inc.*,
883 F.3d 220 (3d Cir. 2018) ......................................................................................................6

*Masco Contractor Servs. E., Inc. v. Beals*,
279 F. Supp. 2d 699 (E.D. Va. 2003) .....................................................................................13

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
201 F.3d 436 (4th Cir. 1999) ..................................................................................................11

*In re Nexium (Esomeprazole) Antitrust Litig.*,
968 F. Supp. 2d 367 (D. Mass. 2013) .......................................................................................8

Case 2:18-cv-00023-RBS-DEM   Document 173   Filed 11/16/18   Page 4 of 20 PageID# 2355

*In re Niaspan Antitrust Litig.*,
   42 F. Supp. 3d 735 (E.D. Pa. 2014) ............................................................................... 8

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
   745 F.3d 131 (4th Cir. 2014) ....................................................................................... 12

*In re Opana ER Antitrust Litig.*,
   162 F. Supp. 3d 704 (N.D. Ill. 2016) ............................................................................. 8

*Roberts v. Berkle Welding & Fabricating, Inc.*,
   No. 3:17-cv-315, 2018 WL 4189626 (E.D. Va. Aug 31, 2018) ................................... 3

*United Food & Commercial Workers Local 1776 & Participating Employers*
   *Health & Welfare Fund v. Teikoku Pharma USA, Inc.*,
   74 F. Supp. 3d 1052 (N.D. Cal. 2014) ........................................................................... 8

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ......................................................................... 13

I.      INTRODUCTION

In their opposition brief, Dkt. No. 191 (the "Opposition"), DPPs do not deny that their Complaint is founded on speculation about what the terms of the Settlement Agreement between Merck and Glenmark might be.  Specifically, DPPs' suit—which they filed before seeing the Agreement—is predicated upon the mistaken belief that the Settlement Agreement prevented Merck from selling an Authorized Generic ("AG") in competition with Glenmark's product during the first 180 days following its launch.  Based on that factual predicate, DPPs urge this Court to be the first in the Fourth Circuit to hold that an agreement not to sell an AG is sufficient to qualify as a "large and unjustified" payment under *FTC v. Actavis*, 570 U.S. 136 (2013).  They have not alleged and do not argue in their Opposition that any other form of "payment" was made by Merck to Glenmark, or that some unwritten agreement was entered into between Defendants—circumstances that were present in the other so-called "pay for delay" cases upon which DPPs rely.

Yet, when confronted with the actual terms of the Settlement Agreement, which show that their speculation about a "No-AG" clause was wrong, DPPs neither withdrew their Complaint (as they should have) nor amended.  Instead, they filed the Opposition, which alternately argues that the Court should ignore the plain terms of the Settlement Agreement at this stage (which is wrong as a matter of law) and strains to turn those terms into something they are not.  Rather than focus on Glenmark's actual arguments, DPPs devote the majority of their Opposition to the question of whether Merck's ability to launch a second *branded* ezetimibe product would have created meaningful price competition with Glenmark's product.  DPPs completely ignore that, pursuant to the express terms of the Settlement Agreement: (1) Merck had the ability to launch an authorized generic itself or through a subsidiary; and (2) Merck broadly retained the right to compete with Glenmark using all conventional means.  Remarkably,

those provisions of the Agreement, which strike at the heart of DPPs' theory of the case, are never mentioned in the Opposition, much less refuted.

DPPs' Opposition also fails to come to grips with the fact—which DPPs candidly acknowledged in their Complaint—that Merck's patent was later upheld as valid by the very judge who oversaw the suit between Merck and Glenmark in a decision that was affirmed by the Federal Circuit. In the face of this fact, DPPs' conclusory allegations that Glenmark would have achieved a different result are wholly insufficient and simply not plausible. This forecloses DPPs from demonstrating anticompetitive effects and independently dooms their Section 1 claim. Further, DPPs' Opposition fails to identify any well-pled, legally-cognizable allegation demonstrating specific intent on the part of any one of the separately-named Defendants, which is required to allege a claim for conspiracy to monopolize under their Section 2 claim.

Inasmuch as DPPs cannot plead, consistent with the actual language of the Settlement Agreement, the existence of a large and unjustified payment sufficient to trigger antitrust scrutiny under *Actavis*, and because DPPs' Sherman Act claims fail for other independent reasons, the Complaint should be dismissed. DPPs' decision not to amend and instead to stand on their current pleading and argue new equally meritless theories in their Opposition confirms that amendment would be futile. Thus, dismissal should be with prejudice.

**II. ARGUMENT**

    **A. <u>DPPs' Argument That Their Allegations Should Be Credited Over the Plain Terms of the Settlement Agreement Is Wrong.</u>**

DPPs assert that the speculative allegations in their Complaint should control regardless of the contents of the Settlement Agreement. DPPs' Br. at 11. Yet they do not dispute the binding Fourth Circuit precedent Glenmark cites, which provides that courts on a Rule 12 motion should not credit allegations that are contradicted by documents properly subject to judicial

notice, such as the Settlement Agreement here. Glenmark Br. at 16-17, Dkt. No. 158 (collecting cases).

DPPs' argument on this issue rests entirely on *Roberts v. Berkle Welding & Fabricating, Inc.*, No. 3:17-cv-315, 2018 WL 4189626 (E.D. Va. Aug. 31, 2018). DPPs' Br. at 8 n.39, 11 n.53. *Berkle*, however, is inapposite. In that case, there was a dispute over whether the one-page document defendant attached to its motion to dismiss was integral to the complaint, constituted the entirety of the employment contract in dispute, and was authentic. *Berkle*, 2018 WL 4189626, at *4-5. No such controversy exists here. DPPs do not contest the authenticity or completeness of the Settlement Agreement, nor do they dispute that it is integral to the Complaint.

Thus, the actual terms of the Settlement Agreement, and not speculation in DPPs' Complaint about what those terms might be, control. Glenmark Br. at 16-17.

### B. DPPs Ignore the Relevant Terms of the Settlement Agreement and Misconstrue Others in an Effort to Create a No-AG Commitment Where None Exists.

In asserting that they have alleged and can establish the necessary "large and unjustified payment" under *Actavis*, DPPs' Opposition simply ignores the fact that Merck preserved the right to do exactly what DPPs speculate it agreed not to do—compete with Glenmark using all conventional means, including selling its own AG. Instead, DPPs continue to press their original theory of this case by assuming their conclusion of a No-AG and either ignoring or misconstruing the actual terms of the Agreement. *See* DPPs' Br. at 9-11.

#### 1. DPPs Ignore That the Settlement Agreement Reserved For Merck the Ability to Launch an AG Itself or Through a Subsidiary.

DPPs' claims are predicated on the thesis that Merck made what is tantamount to a large and unjustified payment to Glenmark in exchange for delaying the launch of generic Zetia by

3

agreeing not to compete on price with Glenmark's generic product during Glenmark's period of statutory exclusivity. Compl. ¶¶ 3, 183, Dkt. No. 128. DPPs' Opposition asserts that the only effective way for a branded manufacturer to compete on price with generic products is through the launch of an AG. DPPs' Br. at 9-11, 18. But this argument is not only wrong, it is also inconsistent with DPPs' Complaint, which implicitly concedes that AGs are just one way branded firms can compete with generic firms and acknowledges that branded firms do not always launch AGs. Compl. ¶¶ 40, 55, 185 (asserting that companies "can" and "often" launch AGs as one way to compete with generic entry). Indeed, DPPs do not even claim that Merck always responded to generic competition by launching an AG.

Even setting that incongruity aside, DPPs do not identify any express provision of the Settlement Agreement where Merck agreed to refrain from price competition with Glenmark—through either a branded or generic form of Zetia. Although DPPs offer various arguments for why competition with a branded product is inferior to launching an AG, DPPs simply ignore that (1) there is no express term in the Settlement Agreement committing Merck not to launch an AG itself or through an affiliate, (2) Merck affirmatively preserved for itself the ability to launch an AG under its own trade name or that of an affiliate, and (3) Merck broadly preserved the right to compete against Glenmark using all "conventional commercial conduct." Settlement Agreement §§ 1.14, 5.3, 7.2(c); Glenmark Br. at 17-19.

The "surprise twin" strawman that is the main focus of DPPs' Opposition—that Merck could not effectively compete with Glenmark's generic Zetia by launching a second branded product, DPPs' Br. at 12—is both wrong and beside the point. While branded products bearing a distinct trademark are one of many ways NDA holders may elect to compete with generics, Merck preserved the ability to launch an AG under its own trade name or that of an affiliate:

4

> The term "Generic Ezetimibe" shall mean a drug product containing ezetimibe as its sole active ingredient . . . (b) that is sold pursuant to NDA No. 21-445 but is not sold under the trademark Zetia® or another trademark *or trade name* of Schering, MSP or their Affiliates.

Settlement Agreement § 1.14 (emphasis added).

In the context of the Settlement Agreement, Section 1.14(b) *excludes* from the definition of "Generic Ezetimibe," and thus the limited exclusive license Merck provided to Glenmark in Section 5.3, certain types of products that Merck and its affiliates could continue to sell under its NDA for Zetia. *Id*. §§ 1.14, 5.3. One such exclusion—meaning products Merck retained the right to sell—is for products sold under a "trade name" of Merck or one of its affiliates, *e.g.*, an AG launched by Merck.

DPPs attempt to evade the significance of this exclusion by misconstruing the term "trade name" to refer to a brand name product. *E.g.*, DPPs' Br. at 12. But, as explained in Glenmark's opening brief, a trade name refers to the *company name*, not the *brand name* of a product. Glenmark Br. at 16-17. A non-branded product sold under a Merck trade name (or, for example, that of a generic subsidiary) would squarely meet the definition of an AG that DPPs espouse. DPPs' Br. at 9-12, 15, 18. Indeed, in their Complaint, DPPs define an AG as "essentially the brand product in a different package." Compl. ¶ 59;[1] Merck explicitly retained the right to sell such a product. This is fatal to DPPs' claim.

Further, there is no requirement (and DPPs cite none) that a product sold under a trade name of a manufacturer must also be sold as a branded product with a distinct trademark. Nor

---

[1] DPPs do not claim – nor could they – that the "different package" cannot have the manufacturer's trade name on it (or even a unique trademark). The use of a trade name has no bearing on a product's ability to compete. Indeed, Glenmark is unaware of any pharmaceutical product that does not carry the trade name of the company that manufactured or distributed that product on its label.

5

does the Settlement Agreement equate a product sold under a "trade name" exclusively with a branded product, as DPPs suggest throughout their Opposition without citation to authority. Instead, the plain terms of the Settlement Agreement distinguish between products launched under trademarks and trade names—separating the two terms with the disjunctive "or." Settlement Agreement § 1.14(b) (referring to products sold "under the trademark Zetia® or another trademark *or* trade name of Schering, MSP or their Affiliates." (emphasis added)). Thus, Merck had and retained the legal right to sell a version of its product with its trade name ("Merck") that did not also include its trademark ("Zetia"). This meets DPPs' own definition of an AG.

DPPs' attempt to conflate the separate terms "trademark" and "trade name" to mean trademark not only ignores the plain meaning of the term; it violates the basic tenant that "contract provisions are to be interpreted so as to give each provision meaning, rather than rendering some provisions superfluous." *E.g.*, *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 229 (3d Cir. 2018) (interpreting New Jersey law); Settlement Agreement § 10.3 (selecting New Jersey law). While DPPs contend that the rules of contract interpretation do not apply in antitrust cases, DPPs' Br. at 13, the authorities they cite for this proposition involved unwritten or tacit agreements to restrain competition.[2] That argument is irrelevant here, where the only alleged basis for the purported anticompetitive agreement is the written Settlement Agreement

---

[2] *See* DPPs' Br. at 13 nn.55-56 (citing *Picone v. Shire PLC*, No. 16-cv-12396, 2017 WL 4873506, at *3 n.3, *10 (D. Mass. Oct. 20, 2017) (discussing allegations of an implied No-AG); Areeda & Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1404 (4th ed.) (discussing when assent to an agreement can be inferred from actions); *see also In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 244 (D. Conn. 2015) (noting that the generic defendant argued it received a No-AG as part of the patent settlement agreement at issue; no statement that rules of contract interpretation are inapplicable in antitrust cases).

itself. Tellingly, DPPs fail to cite any case holding that the ordinary rules of contract interpretation are inapplicable when the basis for the anticompetitive agreement is rooted solely within the four corners of a written agreement.

Nor can DPPs sidestep the Settlement Agreement's plain language by characterizing the risk to Glenmark that Merck could launch an AG under its own trade name as a mere "hypothetical." *See* DPPs' Br. at 17. As the Federal Trade Commission—the agency to which all settlement agreements in Hatch-Waxman Act litigation are required by law to be submitted— expressly recognized in the 2011 report that DPPs cite repeatedly in their Complaint,[3] branded companies do, in fact, launch AGs themselves or through one of their subsidiaries or divisions. Federal Trade Commission, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact (August 2011) (the "FTC AG Report") at 14, 17. Indeed, the FTC AG Report refers to instances where Schering, the Merck predecessor that entered into the Settlement Agreement, did just that. *Id*. at 19, Figure 2-3 (referencing "Schering-Plough (Warrick)" and noting that the figure "include[s] only AGs for which the firm held the NDA and marketed the AG itself"). In this case, the fact that Merck preserved for itself the ability to launch an AG bearing a trade name of Merck or one of its affiliates is, as the FTC noted, much more than theoretical; it forecloses DPPs' claim of a large and unjustified payment sufficient to trigger antitrust scrutiny under *Actavis*.

        **2.**      **None of DPPs' Cases Involved Agreements In Which the Brand Preserved Its Own Ability to Sell an AG.**

The decisions from other Circuits that DPPs cite in support of their strained effort to fit this case into their No-AG rubric do not help them. DPPs' Br. at 15-16. None of those cases involved a provision that reserved for the brand the ability to sell an AG under its trade name or

---

[3]     Compl ¶¶ 54 n.22, 58 n.24, 63 n.28, 64, n.30.

7

more broadly to engage in all forms of conventional commercial competition with the generic—a point Glenmark highlighted in Appendix A to its opening brief. Glenmark Br., App. A., Dkt. No. 158-1. Instead, all of the DPPs' cases involved alleged explicit or implicit No-AG commitments where the brand agreed not to launch a generic, either directly or through a third party. DPPs' Br. at 14-15; *see also id* at 15 n.59.[4]

Notably, in its 2011 report, the FTC specifically recognized the distinction that DPPs ignore. The FTC reported that it had found 75 settlement agreements during the studied period "that involved AGs in ways that raised potential competitive concerns." FTC AG Report at 142. The FTC specifically noted that there were other types of AG provisions that did not raise such

---

[4] Some of the cases DPPs cite involved the question of whether No-AGs are subject to antitrust scrutiny under *Actavis* at all. Glenmark addressed that question in is opening brief, Glenmark Br. at 14-15, but the Court does not need to reach it in this case since there is not a No-AG commitment in the first place. *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 399 (3d Cir. 2015) ("*Lamictal*") (stating that issue on appeal is whether antitrust scrutiny under *Actavis* is "limited to reverse payments of cash"); *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 333 (D.R.I. 2017) ("*Loestrin*") (addressing same issue); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 750 (E.D. Pa. 2014) (same); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 391-92 (D. Mass. 2013) ("*Nexium*") (same). Moreover, each of the cases DPPs cite involved allegations that the No-AG prevented the branded manufacturer from launching an AG entirely, unlike the Settlement Agreement here. *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 258 (3d Cir. 2017) (referring to allegations that brand "agreed it would not compete with [the generic] by producing an authorized generic of either Effexor XR or Effexor IR"); *Loestrin*, 814 F.3d 538, 546 (1st Cir. 2016) (noting allegation that brand "agreed not to market, supply, or license an AG version of" the branded medication); *Lamictal*, 791 F.3d at 397 (referring to allegation that "GSK also agreed not to market an authorized generic until January 2009"); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 713, 717 (N.D. Ill. 2016) (agreement involved commitment by brand to "refrain from launching an AG version of Opana ER"); *In re Nexium*, 42 F. Supp. 3d 231, 264-65 (D. Mass. 2014), *aff'd*, 842 F.3d 34 (1st Cir. 2016) (observing that brand only "retained the right to continue to sell brand Nexium"); *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1063 (N.D. Cal. 2014) (noting allegation that brand "agreed not to release their authorized generic" product until months after first ANDA filer launched).

8

concerns, including "*agreements that precluded launch of an AG by a third party but allowed the brand to launch an AG . . .*" *Id.* at 142 n.11 (emphasis added).

### 3. The Other Settlement Agreement Provisions That DPPs Cite Do Not Support Their No-AG Theory.

DPPs also resort to misconstruing other terms of the Settlement Agreement in an attempt to bolster their claim of a No-AG commitment. DPPs assert new theories that go well beyond the allegations in their Complaint, and thus are not properly before the Court. But, even if they are considered, the terms DPPs cite have nothing to do with whether DPPs have pled the existence of a No-AG agreement.

For example, DPPs cite to an acceleration clause in the Agreement that had the potential to allow Glenmark to launch early if sales of the branded product dipped below a specified threshold. DPPs' Br. at 7. That does not support DPPs' claims because acceleration clauses are procompetitive. *See* Glenmark Br. at 22. Nor do DPPs explain how this clause makes more plausible DPPs' allegations of a No-AG, and they fail to cite any case that supports them. Next, DPPs refer to provisions that they assert reflect the weakness of Merck's patent, including the payment of Glenmark's attorneys' fees and an agreement to enter a motion to vacate the patent court's earlier summary judgment rulings. DPPs' Br. at 7-8. Here again, DPPs fail to explain how such provisions support the inference of a No-AG agreement, particularly in the face of the express terms of the Settlement Agreement discussed above.[5]

\*   \*   \*

---

[5] Although DPPs refer to Merck's commitment to reimburse Glenmark's attorneys' fees in the patent litigation as evidence that Merck's patent position was weak, DPPs' Br. at 7 n.32, they did not plead and do not argue that it qualifies as a "large and unjustified" payment under *Actavis*. Nor could they. Payment of past fees is a common settlement term in all manner of litigation.

9

In short, DPPs cannot avoid the plain language of the Settlement Agreement, which does not contain the No-AG commitment they wrongly-assumed existed when they filed their Complaint. In the absence of plausible allegations that are consistent with the Settlement Agreement and that establish the existence of a No-AG promise from Merck to Glenmark, DPPs are incapable of demonstrating the requisite large and unjustified payment necessary to trigger antitrust scrutiny under binding Supreme Court precedent in *Actavis*.

### C. DPPs Have No Response to the Argument That, Because the Patent Was Upheld As Valid, Their Theory of Anticompetitive Effects Is Implausible.

DPPs do not directly respond to Glenmark's argument that the Complaint does not plausibly allege that the Settlement Agreement delayed the launch of Generic Zetia given the adjudicated validity of the reissued version of the '721 patent. Glenmark Br. at 24-27. The Complaint thus fails to plausibly allege anticompetitive effects, *i.e.*, the existence of improperly-delayed generic entry, which is an essential element of a Section 1 claim.

DPPs try to evade the merits of Glenmark's argument by responding instead to points that Glenmark did not make. DPPs first mischaracterize Glenmark's argument as one of causation, *i.e.*, whether delayed entry caused them harm. DPPs' Br. at 22-23. But this is not Glenmark's argument at this stage. DPPs next take a position even further afield; they claim that Glenmark seeks a finding that DPPs are "collaterally estopped . . . from arguing that Glenmark would have prevailed on the merits." DPPs' Br. at 25. Having introduced this red herring, DPPs explain that the collateral estoppel doctrine does not apply at this juncture.[6] DPPs' Br. at 26-27. That may be true, but is irrelevant. Glenmark is not arguing collateral estoppel either.

---

[6] DPPs primarily rely on *In re Lipitor Antitrust Litigation*, 868 F.3d at 267, as support for their argument that what Glenmark is effectively arguing is collateral estoppel. That decision is not only nonbinding but distinguishable. The *Lipitor* decision turned on the Third Circuit's conclusion in the *Walker Process* fraud context that "[n]either [Defendant] nor the District Court

10

Glenmark's argument, which DPPs do not dispute, is that pleading anticompetitive effects requires facts to show that there was a delay in generic entry beyond what the patent would permit. *Actavis*, 570 U.S. at 147. That is because absent a finding of invalidity (the only issue that Glenmark and Merck were set to try), the Settlement Agreement that DPPs challenge was *procompetitive*—it allowed generic entry prior to the expiration of Merck's regulatory exclusivity. Glenmark Br. at 18, 26-27; *Actavis*, 570 U.S. at 154 (observing that "settlement on terms permitting the patent challenger to enter the market before the patent expires would also bring about competition, again to the consumer's benefit"); *cf. Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436 (4th Cir. 1999) (per curiam) (acknowledging "risk that the threat of antitrust liability will chill legitimate, procompetitive conduct by market participants").

In an effort to satisfy this element, DPPs posit that absent the Settlement Agreement, Glenmark and Merck either would have reached a different settlement that allowed for even earlier generic entry, or that Glenmark would have won the patent litigation. DPPs' Br. at 21. As to the first hypothesis, DPPs have not alleged any facts upon which the Court could plausibly find that the parties would have agreed to an earlier licensed entry date. *See* Glenmark Br. at 27 n.12.

As to DPPs' theory that Glenmark would have won its patent litigation, DPPs have not set forth well-pled facts to show that Glenmark would have invalidated the '721 patent at trial. On the contrary, the only well-pled facts demonstrate that the patent would have been upheld. As DPPs acknowledge, both Mylan and Glenmark separately challenged versions of the '721 patent before the same district court judge—a judge who held, after a bench trial in the Mylan

---

challenge[d] the sufficiency or specificity of [Plaintiffs'] allegations based on the face of the complaint." *Id*. Here, in contrast, Glenmark is doing exactly that—challenging under *Twombly* the sufficiency and plausibly of DPPs' allegations of generic delay. Glenmark Br. at 24-27.

11

litigation, that the reissued version of the '721 patent was *valid*. Compl. ¶ 241. The Federal Circuit subsequently affirmed. *Id.* at ¶ 241 n.62. DPPs offer nothing to plausibly allege that Glenmark's suit would have resulted in a different outcome. Rather, they allege simply that "Mylan had a limited amount of time to present its case," *id.* ¶ 238, and that "Mylan's litigation strategy reflected the choice of not necessarily the best substantive defense," *id.* ¶ 239. Using "judicial experience and common sense," these speculative assertions that are "devoid of further factual enhancement" do not support a plausible inference that Glenmark could have prevailed where Mylan did not. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (observing that the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments" (citations omitted)). In short, DPPs' assertion that Mylan could have prevailed if it tried its case differently simply because DPPs say so is not sufficient to "nudge" DPPs' theory of anticompetitive effects from "conceivable" to "plausible." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007); *see also, e.g.*, *A.G. ex rel. Maddox v. v. Elsevier, Inc.*, 732 F.3d 77, 80-81 (1st Cir. 2013) (finding "conclusory statement" in complaint implausible where it was "presented as an *ipse dixit*, unadorned by any factual assertions").

### D. DPPs' Opposition Does Not Identify Any Well-Pled Facts From Which the Requisite Inference of Specific Intent to Monopolize Could Be Drawn.

DPPs' attempt in their Opposition to rescue their Section 2 conspiracy to monopolize claim suffers from the same flaw as the Complaint itself—there are no facts suggesting that any one of the various named defendants acted with the requisite specific intent to monopolize the relevant market, which is an "intent [that] goes beyond the mere intent to do the act." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985). Instead, DPPs refer back to their allegations of conduct, *i.e.*, the non-existent No-AG commitment. But these allegations

do nothing more than identify an intent to commit the (non-existent) act. DPPs' Br. at 28 n.108. DPPs do not cite to any factual allegations that support the inference that any one Defendant acted with an intent to monopolize a market that "goes beyond the mere intent to do the act." *Aspen Skiing Co.*, 472 U.S. at 602.[7]

In fact, DPPs' Opposition concedes, as it must, that the Complaint does not contain even the legal recitation of specific intent. Instead, DPPs refer to the *Retailers'* complaints for that point. DPPs' Br. at 28. But, even if the Retailers' recitation of the legal element were considered to support the DPPs' Complaint (which of course it cannot be), it is deficient since the Retailers' complaints also fail to plead facts to plausibly establish that any one of the Glenmark and Merck entities acted with the requisite specific intent that one of them would become a monopolist. *E.g.*, *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 382-83 (S.D.N.Y. 2016) (dismissing conspiracy to monopolize claim for failing to plead specific intent where plaintiffs did "not allege that defendants conspired to confer monopoly power on any single entity"). Since DPPs have not identified any well-pled facts from which specific intent can be inferred, DPPs' Section 2 claim lacks an essential element and should be dismissed.

### E. DPPs' Claims Should Be Dismissed With Prejudice.

The Fourth Circuit has made it clear that "[t]he district court does not serve as a legal advisor to the parties, nor is a dispositive motion a 'dry run' for the nonmovant to 'wait and see' what the district court will decide before requesting leave to amend." *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 292 (4th Cir. 2018). Despite having received the Settlement Agreement before responding to Glenmark's motion to dismiss, DPPs elected to

---

[7] DPPs' argument that *Aspen Skiing Co.* does not apply because it involved an attempted monopolization claim, DPPs' Br. at 29 n.113, is erroneous. Both attempt and conspiracy variants of a Section 2 monopolization claim require specific intent. *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 708 (E.D. Va. 2003) (Smith, C.J.) (reciting elements).

stand on their Complaint's speculative allegations and take a "dry run," rather than amend. In this circumstance, dismissal with prejudice is appropriate under Fourth Circuit law. *See id*. Moreover, even considering the theories argued in DPPs' Opposition, *e.g.*, DPPs' Br. at 1 n.2, 6-7, 17-18, 28, those additions do not change the fact that the Settlement Agreement does not include the No-AG promise that DPPs speculated existed when they filed their Complaint. And, given the express terms of the Settlement Agreement, no amendment could cure this defect. *E.g.*, *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008) (affirming dismissal with prejudice where "it is clear that amendment would be futile in light of the fundamental deficiencies in plaintiffs' theory of liability."). Thus, dismissal should be with prejudice.

### III. CONCLUSION

For the foregoing reasons, the Complaint fails to state a claim and should be dismissed in full and with prejudice.

DATED: November 16, 2018  Respectfully submitted,

   /s/ J. Kevin Fee
J. Kevin Fee (Bar No. 88376)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., NW
Washington, D.C. 20005
Tel: 202.739.3000
Fax: 202.739.3001
kevin.fee@morganlewis.com

Steven A. Reed (admitted *pro hac vice*)
R. Brendan Fee (admitted *pro hac vice*)
Zachary M. Johns (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel: 215.963.5000
Fax: 215.963.5001
steven.reed@morganlewis.com
brendan.fee@morganlewis.com
zachary.johns@morganlewis.com

Stacey Anne Mahoney (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178
Tel: 212.309.6000
Fax: 212.309.6001
stacey.mahoney@morganlewis.com

*Counsel for Defendants*
*Glenmark Pharmaceuticals, Ltd. and*
*Glenmark Pharmaceuticals Inc., USA incorrectly*
*identified as Glenmark Generics Inc., USA*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2018, I caused a true and correct copy of the foregoing to be filed on the Court's CM/ECF system which will cause copies of the same to be served upon all counsel of record.


DATED:  November 16, 2018               /s/ Zachary M. Johns
                                        Zachary M. Johns

                                        *Counsel for Defendants*
                                        *Glenmark Pharmaceuticals, Ltd. and Glenmark*
                                        *Pharmaceuticals, Inc. USA incorrectly identified as*
                                        *Glenmark Generics Inc., USA*